No. 49,326

STATE OF KANSAS, *Appellee,* v. JOHN ROBERT WHITE and JAMES S.
STEWART, *Appellants.*

(587 P.2d 1259)

Opinion filed December 9, 1978. ▮▮▮▮▮

*Warren G. Jones,* of Alkire, Dwire & Wood, of Wichita, argued the cause and was on the brief for appellant John Robert White; *Willard L. Thompson, Jr.,* of Wichita, argued the cause and was on the brief for appellant James S. Stewart.

*Harold T. Pickler,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, *Vern Miller,* district attorney, and *Stuart W. Gribble,* assistant district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: James S. Stewart and John Robert White were

convicted of murder in the second degree, K.S.A. 21-3402, and felony theft of a motor vehicle, K.S.A. 21-3701. Both appeal, raising numerous points which will be taken up later in this opinion.

We summarize the evidence in the three-week trial as follows: About 1:45 o'clock on Sunday afternoon, July 27, 1975, two Wichita State University students who were employed by a janitorial service to clean an office building in Wichita discovered the body of a man, wrapped in curtain or drapery material, near some trash cans at the rear of the building. The police were called.

The dead man was identified as Claude Ray Faulkner. He was fully dressed except he had no shoes. The cloth in which the body was wrapped, some paper towels, and a car seat which was near the body, were all bloodstained. Later that same day, a bloodstained white chenille bedspread and a curtain were found in a ditch just off the traveled portion of the road near 240 North Hoover, a few blocks from the spot where the body was discovered.

It was determined that the car seat found near the body was from a 1963 four-door Bel Air Chevrolet with red upholstering. A bulletin was issued, and such a car, with the rear seat missing, was stopped. The driver was defendant White; the only passenger was defendant Stewart. There were dark stains on the back of the front seat. The clothing of both defendants was bloodstained. A hearing aid, identified as belonging to the victim, was found inside the vehicle. Both White and Stewart were arrested and charged with homicide, and with theft of the automobile.

White and Stewart shared an apartment at 218 West Gilbert. A search warrant for that property was secured and executed. At the apartment, the officers found signs of a violent struggle. Bloodstains were everywhere: on the wall, mattress, couch, draperies, bedspread, sheets, and on a white shirt. A pair of black shoes were found; these were identified as belonging to Claude Ray Faulkner.

The curtain in which the body was wrapped, and the curtain and bedspread found on North Hoover, were identified as having come from the apartment. The upholstery of the car seat found with the body matched the upholstery of the vehicle in which defendants were stopped. The owner of a Wichita car lot, located a few blocks from the West Gilbert apartment, testified that the

1963 Bel Air Chevrolet was on his lot Saturday evening, July 26, when he closed up; at noon on the following day, Sunday, he discovered that the car had been stolen.

Stewart smoked Pall Mall cigarettes; a Pall Mall cigarette butt was found beside the body, and cigarette ashes were found on the body. Pall Mall cigarette butts were also found in the apartment. At the time of his arrest, Stewart had abrasions on his hands, and they were swollen. White's left eye was black and blue, his chest was scratched, and he had fresh abrasions on his left shoulder. Two witnesses saw Faulkner in company with the defendants late Saturday night or early Sunday morning.

Both Stewart and White have type "O" blood; the deceased, Claude Ray Faulkner, had type "A" blood. The blood on Stewart's clothing, on White's clothing, on the mattress, and on various other items, was type "A."

An examination of the body of Claude Ray Faulkner revealed grievous injuries to his face, head, neck, elbows, hands, and ribs. The deputy coroner who performed the autopsy expressed the opinion that Faulkner's death was caused by strangulation, and by aspiration of blood from the severe injuries to his nose and nasal cavity.

Both Stewart and White gave statements to the police. Each denied any knowledge of or complicity in either the homicide or the theft; and neither implicated the other in either crime. Their stories varied, however, as to where each of them had been during the 24-hour period prior to arrest; and whether they had been together; and from whom they acquired possession of the vehicle.

The defendants first contend that it was error for the trial court to admit certain photographs of the deceased, which the defendants contend are inflammatory and highly prejudicial. The defendants characterized these as "autopsy" photographs. True, these pictures were taken after the body was moved, but all present external views of the body. All photographs are black and white, and none appear to have been taken after any dissection or other medical procedures had been performed. The photographs complained of were first identified by the police officers who took them, and later they were used extensively during the testimony of the pathologist, as an aid to illustrate his testimony. While not pleasant to view, these photographs are a far cry from the inflammatory type of exhibit decried in State v. Boyd, 216 Kan. 373, 377, 532 P.2d 1064 (1975).

We have said that photographs are not rendered inadmissible merely because they are shocking or gruesome, if they are relevant and material to the matters at issue, *State v. Martinez*, 223 Kan. 536, 575 P.2d 30 (1978); and we have repeatedly held that the admission of photographs of a decedent is not error when they are relevant to matters in issue such as the cause and manner of death, and as an aid in the understanding of a pathologist's testimony. *State v. Childers,* 222 Kan. 32, 44, 563 P.2d 999 (1977); *State, v. Henson,* 221 Kan. 635, 646, 562 P.2d 51 (1977); *State v. Villa & Villa,* 221 Kan. 653, 654, 561 P.2d 428 (1977).

We have examined each of the photographs of which complaint is made. These photographs were not repetitious. They were relevant to the issues of the case, and particularly to matters such as intent and cause of death. In addition, the trial judge gave a limiting instruction as an additional safeguard. We conclude that there was no error in the admission of the photographs.

Defendant Stewart also complains of the admission of physical exhibits which were bloodstained. Again, these exhibits were not inflammatory or gruesome, and they were germane to the issues being tried. We find no error.

Second, defendants contend that the trial court abused its discretion in permitting the state to endorse the name of Carmen Palmitier as a witness after the trial had commenced. The record indicates that the state knew of the existence of the witness, but did not know her name until shortly before the request was made. Defense counsel had attempted to interview her prior to that time. Concisely, Mrs. Palmitier's testimony consisted of a statement that she had seen the deceased together with two men, one of whom she identified as Stewart, in the early morning hours of Sunday, July 27, 1975. The trial court, in allowing the late endorsement, directed that defense counsel be given ample time to talk to Mrs. Palmitier before she testified.

We have often said that the right of the state to endorse additional witnesses lies in the sound discretion of the trial court, and its ruling will not be disturbed in absence of a showing of abuse of discretion. The test is whether the defendant's rights have been prejudiced. *State v. Rueckert,* 221 Kan. 727, Syl. ¶ 1, 561 P.2d 850 (1977); *State v. Wilson & Wentworth,* 221 Kan. 359, 559 P.2d 374 (1977). We note that Mrs. Palmitier was not the only

state witness who observed the deceased in the company of the defendants about the same time. Defense counsel made no request for a continuance. Under the circumstances we conclude that the trial court did not abuse its discretion in permitting the late endorsement.

Third, defendants contend that they did not understand the *Miranda* warnings, and did not freely and voluntarily talk to the officers; thus, their respective statements were not the product of "a rational intellect and a free will." *State v. Wilson,* 220 Kan. 341, Syl. ¶ 8, 552 P.2d 931 (1976).

Detective Meyers transported both defendants from the scene of their arrest to the Wichita Police Department. In the *Jackson v. Denno* hearing, Detective Meyers testified that he gave both of the defendants the *Miranda* warning while en route. He testified that both of the defendants had been drinking, and appeared to be intoxicated; however, he was of the opinion that both defendants understood that they were under arrest, knew where they were, and were fully oriented. At the station, each defendant was interviewed by Detective Crisp. At the *Jackson v. Denno* hearing, Detective Crisp testified that he first gave each defendant the *Miranda* warnings, reading from a standard printed form, and that each defendant acknowledged his understanding of the warnings, and signed a waiver form. Both defendants contradicted Detective Crisp's testimony. However, the trial court, after a full hearing, found that the defendants were each given sufficient *Miranda* warnings, and each knowingly and voluntarily waived his rights before talking with Detective Crisp.

The determination of whether a statement is freely and voluntarily given must be based upon a consideration of the totality of the circumstances. Where there is a genuine conflict in the evidence, an appellate court must place great reliance upon the findings of the trial court. If the trial court's findings are based upon competent evidence, they will not be disturbed on appeal. *State v. Young,* 220 Kan. 541, 552 P.2d 905 (1976); *State v. Ralls,* 216 Kan. 692, 533 P.2d 1294 (1975); *State v. Harden,* 206 Kan. 365, 480 P.2d 53 (1971). The evidence before the trial court in the *Jackson v. Denno* hearing adequately supports the trial judge's findings. Detective Crisp's testimony and observations were clear, and were corroborated by the signed waiver forms. Stewart, during cross-examination, admitted reluctantly that he had un-

derstood his rights. The waiver form adequately set forth the *Miranda* rights. We conclude that the trial court did not err in ruling that the *Miranda* rights were properly administered, and the statements of the defendants were knowingly and voluntarily given.

The fourth and most substantial issue raised by the appellants is that the trial court committed prejudicial error when it admitted in-custody statements, given by each defendant out of the hearing and presence of the other, for the reason that such statements violate the rule laid down in *Bruton v. United States,* 391 U.S. 123, 20 L.Ed.2d 476, 88 S.Ct. 1620 (1968), and for the further reason that such evidence is inadmissible hearsay. Contrary to the claim of the state, the record shows that defense counsel made timely objections on these grounds during the *Jackson v. Denno* hearing, and again renewed the objections when the state's witness, Detective Crisp, was first asked to relate his conversations with the defendants before the jury. Contemporaneous objections having been made, the issues are properly before us.

Stated simply, the *Bruton* rule is this: An accused's right of confrontation and cross-examination, secured by the Sixth Amendment to the United States Constitution, and applicable to the states through the Fourteenth Amendment, is violated when the confession of a codefendant, implicating the accused, is received in evidence during a joint trial, even though the trial court admonishes the jury not to consider the confession in determining the guilt or innocence of the accused. The factual background in *Bruton* illustrates the need for the ruling. Bruton and Evans were tried jointly on a charge of armed postal robbery, 18 U.S.C. § 2114. Evans confessed to a postal inspector that Evans and Bruton committed the armed robbery. The confession was admitted in evidence during the trial, and the trial court cautioned the jury to consider the confession only as to Evans, and "not to consider it in any respect to the defendant Bruton, because insofar as he is concerned it is hearsay."

Evans' conviction was later reversed by the Eighth Circuit because it was determined that the confession was wrongly admitted against Evans; the Circuit court, however, affirmed Bruton's conviction. It relied upon the rule laid down in *Delli Paoli v. United States,* 352 U.S. 232, 1 L.Ed.2d 278, 77 S.Ct. 294 (1957). The Supreme Court, on Bruton's petition, granted cer-

tiorari to reconsider *Delli Paoli,* which held that it was proper to receive the confession of a codefendant in a joint trial if the jury was instructed to disregard the confession in determining the guilt or innocence of the non-confessing defendant. In *Bruton,* the court overruled *Delli Paoli,* saying:

"We hold that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. We therefore overrule Delli Paoli and reverse." (p. 126.)

The court quoted the Advisory Committee on Rules, which made this comment in connection with the 1966 amendment to Rule 14, authorizing severance:

" 'A defendant may be prejudiced by the admission in evidence against a co-defendant of a statement or confession made by that co-defendant. This prejudice cannot be dispelled by cross-examination if the co-defendant does not take the stand. Limiting instructions to the jury may not in fact erase the prejudice. . . .' " (p. 132.)

Summing up, the *Bruton* court said:

"Despite the concededly clear [limiting] instructions . . . in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination." (p. 137.)

Justice Fromme thoroughly examined the *Bruton* rule in the recent case of *State v. Sullivan & Sullivan,* 224 Kan. 110, 578 P.2d 1108 (1978). That opinion also discusses a number of later federal cases which recognize that the harmless error rule may be applied in some *Bruton* situations where the evidence of guilt is over-whelming. We pass the question of harmless error at this point.

It is clear that the practice condemned in *Bruton* is the admission of "powerfully incriminating extrajudicial statements of a codefendant" (*Bruton,* 391 U.S. at 135) who does not testify, and which statements are hearsay and inadmissible against an accused. Even with limiting instructions, such evidence should not be received in a joint trial. White and Stewart, however, gave no incriminating statements. Neither admitted complicity in homicide or theft; both denied participating in or committing either offense; and neither sought to incriminate or fasten guilt upon the other. Both gave exculpatory, not inculpatory, statements.

Were the statements hearsay, in the strict sense of the term? While White was not present when Stewart made his statements,

and Stewart was not present when White gave his, none of the statements were offered in evidence by the state *to prove the truth* of the statement. K.S.A. 60-460 defines hearsay in these terms:

"Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence. . . ."

For similar definitions of hearsay, see Rule 801, Federal Rules of Evidence; California Evidence Code, § 1200; and New Jersey Evidence Rule 63.

The statements of White and Stewart were admittedly offered by the state not to establish the truth of what White and Stewart said, but to show that the statements were made; that they were inconsistent; and, in light of other evidence adduced, that they were improbable. Appellants do not here challenge the statements on grounds of relevance, nor did they do so below. Unless there is some specific statutory bar, all relevant evidence is admissible. K.S.A. 60-407.

We have consistently held that extrajudicial statements, offered not to prove the truth of the statement but merely to prove that the statement was made, are not inadmissible as hearsay. *State v. Hollaway,* 214 Kan. 636, 522 P.2d 364 (1974); *State v. Oliphant,* 210 Kan. 451, 502 P.2d 626 (1972); *State v. Trotter,* 203 Kan. 31, 453 P.2d 93 (1969); *State v. Lopez,* 182 Kan. 46, 318 P.2d 662 (1957).

Other jurisdictions have dealt more squarely with the problem at hand. A case in point is *People v. Doyle,* 61 Ill. App. 3d 571, 18 Ill. Dec. 457, 377 N.E.2d 1093, 1099-1100 (1978). Doyle and Bramlett were charged with rape. Doyle did not testify. A police officer testified that Doyle told him that he (Doyle) was home in bed at the time the offense was said to have been committed. Bramlett took the stand and testified that both he and Doyle went to the prosecuting witness's apartment, and that she voluntarily consented to have intercourse with him. On appeal, Bramlett contends that the officer's testimony that Doyle told him he was at home at the time of the crime was, as to Bramlett, highly prejudicial hearsay, inadmissible under *Bruton.* The court says:

"To begin with, the defendant Bramlett is in error when he contends the purpose of the testimony was to prove Doyle was at home when the crime occurred. . . .

"Bramlett is also in error when he says the statement was hearsay. Hearsay is an

extrajudicial statement offered to prove the truth of what is asserted in the statement. . . . The only reason the testimony complained of was admitted was to show Doyle made the statement, not that the statement was true. And when the mere making of the statement is the significant fact, hearsay is not involved. . . . The veracity of the original speaker, Doyle, is not at issue here since the question is not whether the original statement was true. The issue is the veracity of the listener who testified that he heard the statement, and that witness, Officer Mason, could be and in fact was cross-examined. Accordingly, the defendant Bramlett was not denied the right to cross-examine the witnesses against him.

. . . .

"*Bruton* . . . is not applicable for another reason also. That case bars the use of 'powerfully incriminating extrajudicial statements' of a co-defendant . . . where the speaker is not available for cross-examination. There was no 'powerfully incriminating extrajudicial statement' in this case. Doyle merely told Mason he was at home. He did not say Bramlett went to the Mardis apartment. Bramlett said that. Furthermore, he in no way contradicted Bramlett's statement that Vanessa willingly had sexual intercourse with him.

. . . .

"[A]ny error is harmless beyond a reasonable doubt in light of the overwhelming evidence of guilt."

Another pertinent case is *United States v. Tropiano,* 418 F.2d 1069 (2d Cir. 1969), *cert. denied* 397 U.S. 1021 (1970). Tropiano, Pellegrino and Grasso were charged with extortion in violation of the Hobbs Act, 18 U.S.C.A. § 1951. After a joint trial on the extortion and certain conspiracy charges, all three defendants appealed.

Pellegrino had made certain false exculpatory statements to a government agent, who was permitted to testify, during trial, as to Pellegrino's statements—all subsequently established as falsehoods. Tropiano and Grasso argue that *Bruton* precluded the admission of Pellegrino's false exculpatory statements. The circuit court said:

"Tropiano and Grasso argue that no instructions could be sufficient to limit the testimony in the minds of the jury to Pellegrino alone and that the admission denied them the right to confrontation within the scope of *Bruton.* We disagree.

"Pellegrino's statement was completely exculpatory as to him and in no way inculpatory as to his co-defendants. As far as Pellegrino was concerned, the denials were offered not as hearsay for the truth of their contents but as a verbal act by Pellegrino contradicted by evidence subsequently placed before the jury from which a guilty conscience might be inferred. When proven to be false, such an exculpatory statement is 'circumstantial evidence of guilty consciousness and [has] independent probative force.' United States v. Smolin, 182 F.2d 782, 786 (2d Cir. 1950); United States v. Farina, 218 F.2d 62, 63 (2d Cir. 1954). Not every statement of a co-defendant is barred by *Bruton.* See United States v. Lipowitz,

407 F.2d 597 (3d Cir. 1969). Pellegrino's denials contained no accusation against his co-defendants and were not offered for that purpose. . . . Accordingly, a confrontation with Pellegrino was not required by the Sixth Amendment and the appellants have no basis to complain of an unconstitutional admission of evidence." (pp. 1080-1081.)

A third case dealing with extrajudicial statements of codefendants is *People v. Wallace,* 13 Cal. App. 3d 608, 91 Cal. Rptr. 643 (1970). There the California Court of Appeals said:

"The statements were admissible as not being within the hearsay rule. Section 1200 of the Evidence Code defines hearsay evidence as 'evidence of a statement that was made other than by a witness while testifying at the hearing and *that is offered to prove the truth of the matter stated.*' (Italics added.) None of the statements were offered to prove the truth of the matter asserted. Rather, they were offered to show merely that the words were uttered. . . .

. . . .

"Wallace's right under the Sixth Amendment to confront the witness Heaney [a codefendant], who did not testify, was not violated by the admission of his statements. (*Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], *Douglas v. Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074] and *Pointer v. Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065], relied upon by Wallace hold only that an accused's right to confrontation is violated when a confession of a nontestifying codefendant implicating the accused is admitted in evidence. Likewise, *Cook v. Sigler,* 299 F.Supp. 1338, is not in point as it deals with statements of a codefendant incriminating the defendant. Here, as already mentioned, there was no confession nor implication of Wallace by the statements of the codefendants." (p. 618.)

We hold that the statements here introduced in evidence, being exculpatory in nature both as to the declarant and as to the codefendant, and being offered by the state simply to show that they were made, and not to prove the truth of what was said, were not hearsay, and that the admission of the statements does not violate the *Bruton* rule. Since we find no *Bruton* violation, we find it unnecessary to determine the applicability of the harmless error rule in this case.

The remaining assignments of error are presented by Stewart. He claims that the trial court erred in failing to give an involuntary manslaughter instruction. It is the duty of a trial court to instruct the jury not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the charge and upon the evidence presented. This duty persists whether the instruction is requested or not, and even though there is an objection to it. K.S.A. 21-3107.

Defendants were charged with murder in the first degree.

Involuntary manslaughter is a form of homicide, and is a lesser degree of the offense of first-degree murder. *State v. Seelke,* 221 Kan. 672, 675, 561 P.2d 869 (1977). However, in order for such an instruction to be required, there must be some evidence upon which a conviction of the lesser offense could be based. If no evidence of the lesser offense is received, then an instruction on the lesser offense should not be given. *State v. Seelke,* 221 Kan. at 676.

The evidence in this case shows that the deceased, a man much smaller than either of the defendants, was brutally beaten. His ribs were fractured; an elbow was dislocated; his eyes, nose and mouth appeared to have sustained severe blows; there were many lacerations over the body; and the victim had been strangled manually.

The defense called five witnesses. The first, Eula Townsend, an employee of the Town House Motel, testified that Claude Ray Faulkner, whom she knew as "little Ray," was in the motel restaurant between 10 and 11 o'clock p.m. on Saturday, July 26, 1975; he was with a man called "Earl." Donald E. Rogers and Gary Cline, jailers, testified that they noticed nothing unusual about the general physical appearance or the hands of either defendant, and nothing unusual about Stewart's eyes, when White and Stewart were booked in to the Sedgwick County Jail. Nora Blixt, 221 West Gilbert, testified that she saw White and Stewart walking down the street about 12:15 or 12:20 p.m. on Sunday, July 27, 1975. White appeared to be carrying a bottle in a paper sack. Margery Thompson, 219 West Gilbert, testified that about 3:30 or 4 o'clock p.m. on Sunday, July 27, 1975, she noticed a patrol car parked in front of 218 West Gilbert; and at the same time a man who lived at that address, and who resembles one of the defendants, was sitting out on the porch. Neither defendant testified.

The defense was a denial of guilt. There was no evidence that the killing was unintentional, and no evidence that it occurred during the commission of an unlawful act not amounting to felony or during the commission of a lawful act in a wanton or unlawful manner. The statements of the defendants were exculpatory and do not form the basis for an involuntary manslaughter instruction. We find no evidence indicating that the killing was unintentional. Stewart suggests that the victim had been drink-

ing, and he was known to be a homosexual; that both Stewart and White had been drinking; and that any number of things could have occurred, leading to a fight. Finally, he suggests that the victim could have been the aggressor. These are but suppositions and conjectures, however, and find no support in the evidence. Speculation and guesswork do not constitute that minimal evidence necessary to support a conviction. There simply was no evidence of involuntary manslaughter. We conclude that the trial court did not err in refusing to instruct on involuntary manslaughter.

The sixth point raised is that the court should have directed a judgment of acquittal and in failing to do so, allowed the jury "to speculate on circumstantial evidence."

In *State v. Colbert,* 221 Kan. 203, 557 P.2d 1235 (1976), we said:

"In reviewing a trial court's denial of a motion for acquittal under K.S.A. 22-3419, the tests to be applied were set out in *State v. Gustin,* 212 Kan. 475, 510 P.2d 1290 [1973], wherein we held:

" 'A trial judge in passing upon a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes guilt beyond a reasonable doubt is a fairly possible result, he must deny the motion and let the jury decide the matter. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion.' (Syl. 3.)

. . . .

"It has long been the rule of this court that a conviction of even the gravest offenses may be sustained by circumstantial evidence. (*State v. Ritson,* 215 Kan. 742, 529 P.2d 90 [1974]; *State v. Hale,* 207 Kan. 446, 485 P.2d 1338 [1971]; and *State v. Kennedy,* 124 Kan. 119, 257 Pac. 726 [1927].) More recently we have concluded that the probative values of direct and circumstantial evidence are intrinsically similar and there is no logically sound reason for drawing a distinction as to the weight to be assigned to each. (*State v. Wilkins,* 215 Kan. 145, 523 P.2d 728 [1974].) In criminal cases, based upon circumstantial evidence, the test on appellate review is whether there is a basis in the evidence for a reasonable inference of guilt. (See *State v. Ritson,* supra, and cases cited therein.)" (pp. 209-210.)

The evidence in the case before us provides an ample basis for a reasonable inference of guilt. We find no error.

The seventh point raised is that evidence of prior misconduct was improperly admitted in evidence. In the first instance, a witness for the state testified that he had received complaints that

some men were panhandling the customers outside his store. This was before he saw the defendants and the deceased on the date in question; how long before was not specified. There was no objection that the line of questioning sought to show prior misconduct in violation of K.S.A. 60-455. When counsel for the state sought to pursue the matter further, the court sustained a defense objection and that line of questioning ceased.

The second instance was when a defendant witness, a jailer, testified that he remembered Stewart because he had been in jail before. This came from the mouth of Stewart's witness; there was no objection and no motion to strike. We find no prejudicial error.

The final point raised is Stewart's claim that there was no probable cause to support the issuance of the search warrant for his apartment; that the officers proceeded in bad faith; that the officers exceeded the bounds of the warrant and seized items not specified; and that the items seized should have been suppressed. The application for search warrant was signed and sworn to on July 28, 1975, before the judge who issued the search warrant. It seeks authority to search the Chevrolet automobile in which defendants were arrested as well as their apartment at 218 West Gilbert; both the automobile and the dwelling are described with particularity. It recites the following facts: that applicant viewed the body, which was found to be "draped in a white bedsheet, Cannon brand, and an off-white, unlined window curtain or drape." The victim appeared to have been badly beaten; the sheet, drape, and his clothes were bloody, and the victim was shoeless; that a red car seat was found next to the body; the seat was identified by an expert as being the rear seat from a 1963 Chevrolet Bel Air 4-door automobile; that defendants were observed exiting such an automobile, in which the rear seat was missing; that the interior of the car appeared to be bloody, as did the clothing worn by the defendants; that an autopsy conducted about 3 o'clock p.m. disclosed that the deceased had a small puncture wound which could have been caused by a small sharp pointed instrument, and that the deceased had been dead about twelve hours; that an officer drove by 218 West Gilbert and observed through an open door an off-white window curtain similar to the one found draped around the victim's body; that Stewart's name was on the mailbox; that a neighbor, who lives across the street from 218 West Gilbert, said that she heard loud

screaming coming from inside 218 West Gilbert at approximately 6 o'clock Sunday morning; and that the victim was reported to live in a certain apartment and to have the keys to it in his possession, but when found he had no keys with him.

The warrant authorized a search of the dwelling for the victim's shoes, clothing, keys and personal effects; for a white Cannon bedsheet; for an unlined off-white curtain or drape; and for a small sharp instrument. Viewing the application for a search warrant in its entirety—and we have not set all of it out here—we conclude that it disclosed to the issuing magistrate sufficient facts and circumstances, based upon apparently trustworthy information, to lead a reasonable person to believe that one or more items of evidence of the offense were present in the dwelling. Applications for search warrants are to be interpreted in a common-sense fashion. *State v. Ames,* 222 Kan. 88, 563 P.2d 1034 (1977). We conclude that probable cause was established, and the warrant was properly issued.

There is nothing in the record before us to indicate bad faith, or that the officers conducted a search of unreasonable intensity and scope. That some few items of evidence not enumerated in the search warrant were seized, which items were thought to be evidence of the homicide under investigation, does not invalidate the search. See *State v. Hubbard,* 215 Kan. 42, 46, 523 P.2d 387 (1974); *Andresen v. Maryland,* 427 U.S. 463, 49 L.Ed.2d 627, 96 S.Ct. 2737 (1976). We hold that the application, the warrant, and the search were valid. The trial court did not err in refusing to suppress the seized evidence.

The judgment is affirmed.